UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| JOHN T. HERRON,<br><br>    Plaintiff,<br><br>    v.<br><br>COMMISSIONER OF SOCIAL SECURITY,<br><br>    Defendant. | Case No. 3:19-CV-922 JD |

**OPINION AND ORDER**

Plaintiff John Herron applied for social security disability insurance benefits and supplemental security income, alleging that he is unable to work because he is disabled. An ALJ found Mr. Herron not disabled. Mr. Herron filed a complaint asking the Court to reverse the finding and remand for further proceedings based on several alleged errors with the ALJ's decision. The matter is fully briefed and ripe for decision. [DE 14, 16, 19]. For the reasons stated below, the Court remands this matter to the Commissioner for further proceedings.

### I.  FACTUAL BACKGROUND

Mr. Herron filed for disability insurance benefits on March 1, 2016 and supplemental security income on March 29, 2017, alleging disability beginning January 10, 2016. Mr. Herron alleged disability due to attention deficit hyperactivity disorder ("ADHD"), disruptive mood dysregulation disorder, osteoporosis, inability to use left hand due to unknown medical condition, impaired speech due to unknown medical condition, involuntary movements due to unknown medical condition, and unexplained seizure with no prior history. (R. 70–71).

Prior to Mr. Herron's onset date, he was treated for ADHD and a mood disorder as well as a history of alcohol abuse. (R. 269, 1080). In January 2016, Mr. Herron presented to the

emergency room on several occasions with varying symptoms, including rigidity in the left upper extremity, tremors, and uncontrollable shaking. (R. 299, 302–03, 357, 387, 576-83). At this time, he also reported having six seizures per day. (R. 303). Mr. Herron reported pain to his left hand due to episodic contractures and inability to control it as well as uncontrolled tongue movements. (R. 506). Around this time, he was being treated by psychiatrist, Dr. Candice Hunter. (R. 987). He also participated in occupational therapy for his upper extremity dystonia, however, he stopped after seven appointments due to poor attendance and no functional improvement. (R. 441–90). Dr. Hunter noted that he had concentration symptoms and he continued to have tremors and occasional left sided arm jerking motion as well as left arm stiffness, mildly impaired judgment, limited insight and his prescription to Adderall was increased to help with his attention. (R. 525–28).

In May 2016, he was treated at the emergency room for an abnormal purposeless movement disorder. His limbs, hands and fingers were in a tonic flexion position and when straightened resulted in pain. (R. 879). In August, Mr. Herron met with Dr. Danny Bega for an evaluation of his abnormal left arm movements. (R. 698). Dr. Bega found that the non-physiologic nature of the disorder was supported by many exam features. He had fixed flexor posture but the posturing was not present when he was unaware he was being observed. (R. 699-700). Mr. Herron began seeing Dr. George F. Abu-Aita, a neurologist, for his focal dystonia, stuttering, and seizure disorder. Dr. Abu-Aita noted Mr. Herron had not had a seizure since May 2016 but did have staring spells and jerking and his arm was spastic and jerking and also had stuttered speech. Dr. Abu-Aita told Mr. Herron that this could be related to a conversion reaction or dystonia. (R. 726–27).

Dr. Hunter continued to note stuttering speech and abnormal musculoskeletal movements, including tremors and dystonia. (R. 814–15). Dr. Hunter completed an RFC that Herron had difficulty with attention and concentration despite treatment. (R. 771–73). She opinioned that Mr. Herron has problems maintaining personal appearance, relating predictably in a social manner, responding appropriately to supervisors or coworkers and would miss more than four days of work per month. *Id.*

While in prison in September 2017, Mr. Herron suffered a seizure witnessed by prison staff. (R. 1217–18, 1423–43). He continued treatment with Dr. Hunter who noted his mood was down and depressed, has poor social skills, psychomotor was dystonic, he was stuttering, had impaired gait and physical mobility, poor balance, spastic, twitches, and atrophy. (R. 1552–53, 1557, 1572, 1582, 1590, 1594). In February 2018, Mr. Herron was hospitalized for a seizure. He was found by EMS to be semi-responsive and confused with final impression of seizure and hyperkalemia. (R. 1194, 1198, 1315, 1330).

On May 7, 2018, an administrative hearing was held in front of the ALJ, where Mr. Herron and a vocational expert ("VE") testified. (R. 46–69). Mr. Herron testified to his symptoms stating he experienced shaking in the legs that sometimes caused him to fall, altered mood states where he does not know what is going on, and struggles standing still. (R. 56–59). The VE testified that a hypothetical individual with Mr. Herron's RFC could perform jobs in the national economy, namely a packer, laundry laborer, or a sorter. (R. 63). The VE also testified that if a person has difficulty with focus and concentration and is off task two or three additional times a day beyond normal scheduled breaks or they can never handle and finger with the non-dominant left upper extremity, work would be preclusive. (R. 65–66). Additionally, she testified

that if a person has four or more absences on a regular basis, they could not maintain employment. (R. 67).

After the hearing, the ALJ issued an unfavorable decision on August 22, 2018. (R. 28–38). In that decision, the ALJ found that Mr. Herron has one severe impairment—seizure disorder. (R. 30). The ALJ found that Mr. Herron has the following residual functional capacity:

> [T]he claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following nonexertional limitations: the claimant can never climb ladders, ropes, or scaffolds and can never work at unprotected heights. Additionally, the claimant can never work around moving mechanical parts and never operate a motor vehicle for work.

(R. 32–33). The ALJ ultimately found that Mr. Herron was not disabled at step five because he is capable of performing jobs that exist in significant numbers in the national economy. (R. 37). The Appeals Council declined review (R. 5), and Mr. Herron filed this action seeking judicial review of the Commissioner's decision.

## II.  STANDARD OF REVIEW

Because the Appeals Council denied review, the Court evaluates the ALJ's decision as the final word of the Commissioner of Social Security. *Schomas v. Colvin*, 732 F.3d 702, 707 (7th Cir. 2013). This Court will affirm the Commissioner's findings of fact and denial of disability benefits if they are supported by substantial evidence. *Biestek v. Berryhill*, 139 S. Ct. 1148, 1153 (2019); 42 U.S.C. § 405(g). Substantial evidence consists of "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). This evidence must be "more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). Thus, even if "reasonable minds could differ" about the disability status of the claimant, the Court must affirm the

4

Commissioner's decision as long as it is adequately supported. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).

It is the ALJ's duty to weigh the evidence, resolve material conflicts, make independent findings of fact, and dispose of the case accordingly. *Perales*, 402 U.S. at 399–400. In this substantial-evidence determination, the Court considers the entire administrative record but does not reweigh evidence, resolve conflicts, decide questions of credibility, or substitute the Court's own judgment for that of the Commissioner. *Lopez ex rel. Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003). Nevertheless, the Court conducts a "critical review of the evidence" before affirming the Commissioner's decision. *Id.* An ALJ must evaluate both the evidence favoring the claimant as well as the evidence favoring the claim's rejection and may not ignore an entire line of evidence that is contrary to his or her findings. *Zurawski v. Halter*, 245 F.3d 881, 888 (7th Cir. 2001). Consequently, an ALJ's decision cannot stand if it lacks evidentiary support or an adequate discussion of the issues. *Lopez*, 336 F.3d at 539. While the ALJ is not required to address every piece of evidence or testimony presented, the ALJ must provide a "logical bridge" between the evidence and the conclusions. *Terry v. Astrue*, 580 F.3d 471, 475 (7th Cir. 2009).

### III.  STANDARD FOR DISABILITY

Disability benefits are available only to those individuals who can establish disability under the terms of the Social Security Act. *Estok v. Apfel*, 152 F.3d 636, 638 (7th Cir. 1998). Specifically, the claimant must be unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). The Social Security regulations create a five-step sequential

5

evaluation process to be used in determining whether the claimant has established a disability. 20 C.F.R. § 404.1520(a)(4)(i)–(v). The steps are to be used in the following order:

1. Whether the claimant is currently engaged in substantial gainful activity;

2. Whether the claimant has a medically severe impairment;

3. Whether the claimant's impairment meets or equals one listed in the regulations;

4. Whether the claimant can still perform relevant past work; and

5. Whether the claimant can perform other work in the community.

*Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).

At step three, if the ALJ determines that the claimant's impairment or combination of impairments meets or equals an impairment listed in the regulations, disability is acknowledged by the Commissioner. 20 C.F.R. § 404.1520(a)(4)(iii). However, if a listing is not met or equaled, then in between steps three and four, the ALJ must then assess the claimant's residual functional capacity, which is defined as the most a person can do despite any physical and mental limitations that may affect what can be done in a work setting. 20 C.F.R. § 404.1545. The ALJ then uses the residual functional capacity to determine whether the claimant can perform his or her past work under step four and whether the claimant can perform other work in society at step five. 20 C.F.R. § 404.1520(e). The claimant has the initial burden of proof in steps one through four, while the burden shifts to the Commissioner in step five to show that there are a significant number of jobs in the national economy that the claimant is capable of performing. *Young v. Barnhart*, 362 F.3d 995, 1000 (7th Cir. 2004).

## IV. DISCUSSION

Mr. Herron offers two general arguments in support of remand. First, he claims the ALJ erred in formulating an RFC that is not supported by substantial evidence for several reasons: 1)

the ALJ incorrectly relied on the one-time examination by Dr. Bega and outdated agency consultant's opinions due to later evidence; 2) the ALJ failed to include a limitation regarding his speech impairment based on the medical evidence; 3) the ALJ failed to adequately address the record evidence regarding his mental impairments, particularly a diagnosis that meets a listing; and 4) the ALJ erred in weighing medical opinion evidence. Second, Mr. Herron argues the ALJ's analysis of Mr. Herron's subjective symptoms was flawed. The Court only addresses two of the sub-arguments, as the Court agrees that the ALJ failed to adequately address record evidence pertaining to Mr. Herron's mental impairments and the ALJ erred in weighing a treating physician's opinion, therefore requiring remand. The Court need not address the remaining arguments, which can be addressed by the parties on remand.

Mr. Herron argues that the ALJ erred by failing to consider evidence of his conversion disorder[1] diagnosis and provide a discussion of whether this diagnosis was a severe impairment that met a listing. At Step 2, the ALJ concluded Mr. Herron's medically determinable mental impairments of ADHD, anxiety, depression, and mood disorder do not cause more than a minimal limitation in his ability to perform basic mental work activities and is therefore non-severe. (R. 31–32). Mr. Herron argues the record supports a diagnosis for a conversion disorder, which by definition would satisfy Step 2 of the disability standard because it is a severe impairment. The DSM-V definition for conversion disorder lists the following criteria: "one or more symptoms that affect body movement or your senses[,] [s]ymptoms can't be explained by a

---

[1] A conversion disorder is classified psychiatrically as a somatoform disorder. *Conversion Disorder*, Harvard Health Publishing, https://www.health.harvard.edu/newsletter_article/Conversion_disorder, (last updated Mar. 2014). "The term 'somatoform disorder' refers to what used to be called 'psychosomatic' illness: one has physical symptoms, but there is not physical cause." *Sims v. Barnhart*, 442 F.3d 536, 537 (7th Cir. 2006). According to the Social Security Administration regulations, somatic symptoms and related disorders is characterized by "physical symptoms or deficits that are not intentionally produced or feigned, and that, following clinical investigation, cannot be fully explained by a general medical condition, another mental disorder, the direct effects of a substance, or a culturally sanctioned behavior or experience." 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07.

neurological or other medical condition or another mental health disorder[, and] [s]ymptoms cause significant distress or problems in social, work or other areas, or they're significant enough that medical evaluation is recommended."[2]

While the Court does not reach whether Mr. Herron's conversion disorder diagnosis, standing alone, satisfies the "severe impairment" requirement at Step 2, it does find it troubling that the ALJ's decision is completely devoid of any consideration of the conversion disorder diagnosis at any step of the analysis, despite the record being replete with multiple medical providers diagnosing Mr. Herron with conversion disorder. (*See, e.g.*, R. 427, 441–90, 532, 545, 618, 698, 727, 1228, 1246). The ALJ did not confront any of this evidence in formulating the RFC nor did he discuss the evidence within the context of Listing 12.07. While the Court realizes that an ALJ need not discuss every piece of evidence in the record in rendering his decision, the ALJ cannot "cherry-pick" facts that support a finding of non-disability while ignoring evidence that points to a disability finding. *See Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). Here, by failing to provide any explanation or discussion of conversion disorder, the ALJ ignored an entire line of evidence that is contrary to his findings. *Zurawski*, 245 F.3d at 888.

Listing 12.07 describes somatic symptoms and related disorders and in part, requires medical documentation of symptoms of altered voluntary motor or sensory function that are not better explained by another medical or mental disorder and an extreme limitation of one, or a marked limitation of two, areas in the paragraph B criteria of mental functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.07. The Commissioner argues that the ALJ noted that evidence in the record shows that the etiology of Mr. Herron's abnormal movements was unclear and therefore not all medical sources agreed that he had conversion disorder. Significantly, however, the ALJ

---

[2] *See Functional neurologic disorders/conversion disorder*, Mayo Clinic, https://www.mayoclinic.org/diseases-conditions/conversion-disorder/diagnosis-treatment/drc-20355202, (last visited Feb. 16, 2021).

did not discuss this conclusion or even indicate that he considered the conversion disorder diagnosis at all. The agency "may not bolster the ruling with evidence the ALJ did not rely on." *Shauger v. Astrue,* 675 F.3d 690, 697 (7th Cir. 2012). Instead, the ALJ only noted evidence in the record that supported his conclusion that no clear etiology was established, or even that Mr. Herron's abnormal movements were artificial, ignoring that his symptoms are consistent with a conversion disorder, which greatly impacts his ability to function in work or social settings. The ALJ failed to provide this Court the opportunity for meaningful review of whether he did in fact find the record on the etiology of his abnormal arm movements conflicting or why he weighed opinions of no clear etiology, or fabrication of the movements, higher than those of conversion disorder and failed to create the logical bridge from the evidence to this conclusion.

Further, the Commissioner argues that while the ALJ did not name conversion disorder in his decision, he did consider evidence of its effects throughout the decisions, namely the dystonic features in his left hand and arm. (R. 33–36). However, this argument falls short because the Seventh Circuit has "held that [when] considering whether a claimant's condition meets or equals a listed impairment, an ALJ must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Kastner v. Astrue,* 697 F.3d 642, 647 (7th Cir. 2012) (citation omitted). While the Court acknowledges that the ALJ did discuss Mr. Herron's left arm movements, rigidity, spasms, and pain, he did not do so in the context of a listing nor did he give any discussion to Mr. Herron's conversion disorder diagnosis. Rather, the ALJ seemed to question whether Mr. Herron suffered from the dystonic features at all. The ALJ here did not consider any of the evidence in discussing the listing by name nor did he even provide a perfunctory analysis of the listing. The record includes medical documentation of symptoms of Mr. Herron's altered voluntary motor or sensory function, including rigidity or movement in his

upper left extremity, muscle spasms, and his inability to use his left hand. (*See, e.g.*, R. 422, 479, 499, 506, 512, 527, 576, 611–13, 618, 703, 726-27, 747, 757, 779, 801, 879, 1280, 1459–61, 1486, 1557, 1582, 1590). Yet, although this is the threshold symptom of Listing 12.07, the ALJ erroneously omitted any discussion of Listing 12.07.

Additionally, as discussed below, the ALJ does not discuss or properly weigh record evidence regarding Mr. Herron's limitations in the paragraph B mental functioning criteria, as necessary under the second prong of Listing 12.07. Therefore, the mild limitations found by the ALJ does not make the failure to discuss the evidence within the Listing 12.07 context harmless error. The ALJ failed to address evidence that demonstrates that Mr. Herron has poor impulse control, prolonged impairment with work and daily living activities, decreased concentration, problems maintaining personal appearance, relating predictably in a social manner, and responding appropriately to supervisors or coworkers. (*See, e.g.*, R. 771–72, 784, 787, 813).  It is also noted that Mr. Herron has significant agitation (R. 788) or irritability (R. 785) and his therapist noted he had poor social skills and aggressive behavior (R. 1505, 1539, 1553). The ALJ does not address this evidence when evaluating his paragraph B functioning, particularly concerning the areas of interacting with others and concentrating, persisting or maintaining pace.

Later in the opinion, when the ALJ formulates the RFC, he gave the State agency consultants opinions on Mr. Herron's mental limitations great weight, both initially and on reconsideration, which found mild limitations in all mental functioning areas. However, these consultants did not have the opportunity to review the majority of Dr. Hunter's records and therapy treatment notes, including the records from his intensive outpatient program and Dr. Hunter's assessments of Mr. Herron's functioning. Thus, the consultants' opinions were rendered without consideration of evidence demonstrating the severity of his condition. *See Moreno v.*

*Berryhill,* 882 F.3d 722, 728 (7th Cir. 2018), *as amended on reh'g* (Apr. 13, 2018) (noting that an ALJ should not rely on an outdated assessment if later evidence containing new, significant medical diagnoses reasonably could have changed the physician's opinion); *Staggs v. Astrue*, 781 F.Supp.2d 790, 794–96 (S.D. Ind. 2011) (finding that the medical record omitted from review provided "significant substantive evidence" regarding the claimant's medical impairments and that any medical opinion rendered without taking this record into consideration was "incomplete and ineffective."). The ALJ acknowledged the State agency consultants did not have certain evidence from the hearing level to consider, however, only used it as support not to adopt the physical impairment conclusions in the opinions, but still relied on their opinions regarding Mr. Herron's mental impairments. (R. 35). Since the ALJ relied, in part, on outdated assessments of Mr. Herron's mental impairments, the ALJ's finding of mild limitations in all four functioning areas of paragraph B criteria does not render the ALJ's failure to confront evidence of Listing 12.07 harmless.

Although the ALJ did not explicitly conclude that Mr. Herron did not meet Listing 12.07, his complete failure to discuss Mr. Herron's conversion disorder can only lead the Court to conclude that the ALJ never even considered this evidence or ignored it. In reviewing the entirety of the ALJ's decision, the Court finds it "devoid of any analysis that would enable meaningful judicial review," and accordingly, fails to create the necessary logical bridge from the evidence to the conclusion that Mr. Herron's conversion disorder does not meet Listing 12.07. *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003). Errors are harmless when the court can "predict with great confidence that the result on remand would be the same." *Schomas*, 732 F.3d at 707. However, the outcome on remand is not predetermined in this case, and a finding of harmless error would be inappropriate. While some of the medical records that Mr.

11

Herron cites do not bolster his position of a Listing 12.07 finding, he has also pointed out several records that the ALJ either did not fully discuss or omitted entirely from his decision. A review of these records suggests that Mr. Herron may in fact meet Listing 12.07. *See Staggs*, 781 F.Supp.2d at 794–96. Therefore, the Court finds that the ALJ's failure to confront the evidence of Mr. Herron's conversion disorder at all or within the context of Listing 12.07 was harmful as it was not supported by substantial evidence and remand is required.

Lastly, Mr. Herron argues the ALJ improperly weighed his treating psychiatrist Dr. Hunter's June 2017 opinion that he is incapable of sustaining work on a continuous basis due to the likelihood of at least four absences a month. (R. 35). The ALJ afforded this opinion little weight and supported it with the reasoning that the final determination concerning the conclusion of whether an individual is disabled is reserved to the Commissioner. (R. 35–36). The Court agrees with Mr. Herron that the ALJ's reasons for discounting Dr. Hunter's opinion are invalid and constitute reversible error. The Seventh Circuit has held that this is an imprecise application of the regulations and is not a justifiable reason to disregard a medical opinion. *See Bjornson v. Astrue*, 671 F.3d 640, 647 (7th Cir. 2012) (remanding for the ALJ to consider the opinion that the claimant remained unable to work). The Court recognizes that whether a claimant qualifies for benefits is a legal determination to be made by the ALJ. *Garcia v. Colvin*, 741 F.3d 758, 760 (7th Cir. 2013). However, while a physician's opinion that a claimant is disabled or unable to work merits no special significance, a claimant's disability will ultimately depend on his physical or mental ability to perform work tasks and medical opinion evidence that addresses this subject may not be ignored. 20 C.F.R. § 404.1527(d)(3). "[W]hen deciding the claimant's RFC, ALJs must consider a treating physician's view that the severity of a claimant's impairments makes her unable to work." *Knapp v. Berryhill*, 741 F. App'x 324, 327 (7th Cir. 2018).

While the ALJ was correct in not affording controlling weight to the opinion that Mr. Herron was unable to work, he still needed to consider and weigh the entire opinion, including the severity of the impairments, and apply the factors in 20 C.F.R. §§ 404.1527(c). These factors are: the examining relationship; the treatment relationship; the length of the treatment relationship; the frequency of examination; the degree to which the source presents relevant evidence to support the opinion; the consistency of the source's opinion with the other evidence; whether the source specializes in an area related to the individual's impairment; and any other factors tending to support or refute the opinion. 20 C.F.R. § 404.1527(c). If the ALJ does not give the treating physician's opinion controlling weight, the ALJ should explicitly consider these factors to determine the proper weight to give the opinion. *See Yurt v. Colvin*, 758 F.3d 850, 860 (7th Cir. 2014). An ALJ's failure to weigh medical opinion evidence pursuant to these factors mandates remand. *Gerstner v. Berryhill*, 879 F.3d 257, 263 (7th Cir. 2018). If the ALJ discounts the treating physician's opinion after considering these factors, the Court must give deference to the ALJ's decision so long as he "minimally articulate[d] his reasons." *Elder*, 529 F.3d at 415 (internal quotations omitted).

Although the ALJ acknowledged that Dr. Hunter was Mr. Herron's treating physician, he did not discuss the length or frequency of the treating relationship between Dr. Hunter and Mr. Herron. Dr. Hunter met with Mr. Hunter many times between March 2016 and February 2018, including during Mr. Hunter's participation in an intensive outpatient program at Porter-Starke Services, where he was going to therapy three times a week and seeing Dr. Hunter at least every three months. (R. 55). The ALJ also failed to consider that Dr. Hunter's specialty is psychiatry. In addition to the omission of evaluating these factors, the ALJ did not provide sound reasoning in rejecting Dr. Hunter's medical opinion. Dr. Hunter's opinion did not only include that Mr.

13

Herron could not sustain work due to frequent absences but she also opined that Mr. Herron had had difficulty with attention and concentration despite treatment, had problems maintaining personal appearance, relating predictably in a social manner, and responding appropriately to supervisors or coworkers. Additionally, Dr. Hunter opined that Mr. Herron's frustration regarding his current physical limitations prevented his mood symptoms from improving. (R. 772). However, the ALJ did not address any of these other opinions of Dr. Hunter. Instead, the ALJ reasoned that Dr. Hunter's opinion contradicts the medical evidence of record which support improvement of the claimant's symptoms with medication and show that the claimant's judgment, insight, concentration, and executive function are all intact. (R. 36). The ALJ cites to treatment records from Dr. Hunter between June 13, 2016 and July 5, 2017 and one page of treatment records from February 2018 as support of the contradictory record evidence. While these records state these various elements of Mr. Herron's mental status are intact, the same records also state that Mr. Herron has poor impulse control, prolonged impairment with work and daily living activities, and decreased concentration. (*See, e.g.*, R. 784, 787, 813). Additionally, in January and March 2017, Mr. Herron's insight was noted to be fair, not intact. (R. 801, 809). Throughout his records at Porter-Starke Services, it was noted Mr. Herron's mood was down and depressed, he had poor social skills, his psychomotor ability was dystonic, he was stuttering, had impaired gait and physical mobility, as well as poor balance. (R. 1552–53, 1557, 1572, 1582, 1590, 1594). Yet, the ALJ did not address this evidence supporting Dr. Hunter's opinion.

The Commissioner argues the ALJ adequately supported the weight he gave to Dr. Hunter's opinion. In doing so the Commissioner cites to some records the ALJ did not cite as support to discount Dr. Hunter's opinion and pre-date the records that ALJ did in fact cite. If the

14

ALJ considered these records as contradictory to Dr. Hunter's opinion, he did not explain this in his decision. Nor did the ALJ address the evidence supporting Dr. Hunter's opinion as detailed above. An ALJ cannot recite only the evidence that supports his conclusion while ignoring contrary evidence. *See Moore v. Colvin*, 743 F.3d 1118, 1124 (7th Cir. 2014); *Bates v. Colvin*, 736 F.3d 1093, 1099 (7th Cir. 2013). This "cherry-picking" is especially problematic where mental illness is at issue, for "a person who suffers from a mental illness will have better days and worse days, so a snapshot of any single moment says little about [his] overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011). The ALJ failed to adequately explain what evidence is in conflict with Dr. Hunter's opinion as well as failing to address the evidence that supports Dr. Hunter's opinion on the severity of Mr. Herron's mental impairments. Additionally, the ALJ did not discuss all the required factors when weighing his treating physician's opinion. These errors warrant remand.

## V. CONCLUSION

For those reasons, the Court REVERSES the Commissioner's decision and REMANDS for additional proceedings consistent with this opinion. The Clerk is DIRECTED to prepare a judgment for the Court's approval.

SO ORDERED.

ENTERED: February 22, 2021

                                        /s/ JON E. DEGUILIO
                                        Chief Judge
                                        United States District Court